Council of the United States for Proposing the Second Circuit Order, order, order, all parties are having business before this. This is a term of the United States for proposing the second circuit. You're all here, keep your attention, and each other heard. Happy New United States of America and the Son of the Lord. We have a split panel this afternoon. We're starting with the case Vera v. Banco-Bilbao, number 182345, on which we have Judge Cabranes joining us on screen from New Haven, and Judge Lynch and myself. After the conclusion of the argument in this case, we'll take a brief recess, and then we'll proceed with another panel for the rest of the afternoon. You may proceed. Thank you, Your Honor. Kenneth Caruso for the Spanish bank known as BBVA. Your Honors, this Court's decision in Vera from August of 2017 sounded the death knell for the three cases you have here today, Haussler, Vidaldo Sr., and Vidaldo Jr. These cases are indistinguishable from Vera. Like Vera, they involve pre-designation extrajudicial killings and torture. By designation, I mean the 1982 designation of Cuba as a foreign terrorist state. Like Vera, the petitioners have the burden of proof. Like Vera, the petitioners have submitted no evidence showing that specifically links Cuba's designation to these killings or tortures. Well, you say they're indistinguishable, but your adversaries would say that there actually are very different sets of facts that resulted in the deaths of their decedents and that were the basis of their causes of action here. And why aren't they entitled to a separate review of the foundational facts to show whether they were linked or not to the designation of terrorism? They clearly are entitled, under the Vera opinion, to a separate review by this Court. But the result is the same. That's what I mean by indistinguishable. The rule of Vera is that the State Department designated Cuba as a state sponsor of terrorism because of its support for revolutionary violence and groups that use terrorism as a policy instrument. The legislative materials made no mention of Mr. Vera, who was killed. The same can be said of Haussler and Vidaldo. What about Mr. Vidaldo? There were actions taken after 1982 with respect to Mr. Vidaldo. Yes. Vidaldo, Jr., with respect to 1959, in my view, falls with the other cases. Vidaldo, Jr., with respect to the post-designation conduct, falls for a different reason. As a matter of law, his allegations do not amount to torture within the meaning of the FSIA and the TVPA because he doesn't meet either the custody or the severity requirements. The statute requires that the victim have been in the custody of the torturer, and here, their best evidence, laid out at page 22. Mr. Caruso. Yes, Your Honor. Let's go back to something you just said about these parties not having been mentioned. By whom should they have been mentioned? State Department, Your Honor. And in what sense should they have been mentioned? That they should have been mentioned as, that the State Department designated Cuba as a state sponsor of terrorism as a result of these killings and this torture. That's what's required. What if the killings amounted to thousands of people? All of them should have been listed by name? No, no. I think a statement that Cuba was designated because of its retaliatory conduct toward dissident expats might have been sufficient, but you don't even have that. The State Department said they were designated as a result of the support that they gave to these terrorist states in Latin America. It might be sufficient if the State Department had at least mentioned that Cuba was designated as a result of retaliation at expatriates, but that's not even mentioned. Now, the money at issue here belongs to Cuba, in your view. Is that right? Yes. It doesn't belong to the bank. It does not belong to the bank, although we will claim a lien on that property for having defended this case. And you've been fighting this action for years, claiming sovereign immunity, etc. That's correct. So what exactly is the bank's interest here? Why isn't this being, in effect, an interpleader action in which you deposit this money somewhere, whatever money you have, and then announce to the world they can come and get it? Because this case has a long history. The original aspect of this case involved my client as a claimant to the funds. So we started challenging the validity of these judgments way back in 2012 because the money at issue belonged to us. We won that case in the Haussler decision of October 2014. Then we fought the subpoena that Vera served for worldwide discovery, and we had a very important institutional interest in that subpoena because we wanted to resist worldwide discovery of our Cuban conduct. My client's a Spanish bank. Unlike the other banks, we do business in Cuba lawfully. It's totally lawful outside the United States, but we did not want to have to provide discovery of that. That's why we fought so hard, and not only because of its Cuban discovery. We opposed worldwide discovery based on Gucci and Daimler. But we fought very hard because we had an institutional interest in that Vera case. So what's left? Well, the way I look at it, we're finishing the job we started. All three of these judgments are just as void as the Vera judgment. What are we to make of the absence of the other banks who would presumably have equivalent interest to BBVA? No, they settled. They did not have an equivalent interest because they don't do business in Cuba. My client was the only bank that was doing business with Cuba. But if they were subject to an order that grew out of an invalid judgment for one of subject matter jurisdiction, don't they have equivalent rights to restitution and to undoing their... Not anymore, because they settled. Settlement is the settlement. Oh, yes. Well, they were parties, and they waived all their jurisdictional objections and had a judgment entered based on a settlement. They're finished. They can't come back and reopen that. But I've opposed this, as I said, all along. Why exactly do you not settle? Well, for all the reasons I stated, Your Honor. First, we were a claimant and not just a stakeholder. Then we had an important institutional interest in fighting the validity issues so as to avoid worldwide discovery. And now we want to finish the job we started. And we think that this $550,000 in due course is something on which we have a lien after restitution. Is it only $550,000? That's it. That's the sum total? That's the amount that was turned over. I assume there's some minimal amount of interest now. Okay. And do you have a position with regard to, if we were to agree with you on this, whether we could order restitution be paid to the court registry as opposed to return to you, since it's not your property, as Judge Cabranes was pointing out? Money could be turned over to the court registry, of course. But I do think that eventually we can assert a property interest in that for money. The protection of the property of another entitles the protector to reimbursement for expenses. And as a bank, we can assert that by way of set-off. So we do think that we're entitled to have the money returned to us. But obviously if the court simply wanted it turned over to the court registry, that would be a first step. And this isn't in the record, but do you have an estimate of the current amount of those expenses? It will exceed $552,000. Okay. Thank you. You've reserved three minutes. Yes, and that's fine. The other side has the burden of proof on these matters, and I wanted to reserve even more than three, but I was told that that was the maximum, so I like to rebut as much as I can. Very good. As much as you'll allow. Thank you. Thank you very much. Mr. Perkins. May it please the Court, Jim Perkins on behalf of Jeanette Hausler. I'll be splitting my time with Mr. Maxwell. Far from the death knell of these judgments, the Vera case is very different. First of all, the panel that heard that went out of its way to indicate it was different. It was evaluating that judgment alone. The Hausler judgment is a very different both procedural posture and a substantive posture. If you've read the Hausler judgment, it's about a 15-page judgment that was entered following an evidentiary hearing, findings of fact, and explicit findings of fact that the Court concluded that there was a designation in part as a result of the killing of Bobby Fuller. Bobby Fuller stands separate. That was not a matter on which the Cuban government or the bank were present to contest, right? That's correct, Judge. An inquest on a default judgment. That is correct, but that judgment has been tested both in the Southern District of Florida by Mr. Caruso and in the Hausler case by Mr. Caruso. He talks about the fact that there is a long history here. As you may know, our principal argument is, in fact, that he's barred and bound by res judicata, that issue having been fully and fairly determined against his client. He went into the Southern District of Florida to collaterally attack the judgment and try to get it overturned, and Judge Jordan, who had granted that judgment full faith and credit, denied that relief, holding that the BBVA did not have standing to attack it because Judge Marrero in the Southern District in the Hausler case had granted it full faith and credit and, in fact, had enforced it. I also strongly disagree that the banks have settled. They have not. There's a history of turnover orders that the banks have had, as stakeholders have had the monies turned over under TRIA. There are at least half a dozen judgments that are still in effect in the Hausler case, and, in fact, your honors who are here were both on the Hausler panel, and although you decided that electronic funds transfers in the hands of an intermediary bank where Cuba was not the originator could not be reached, that's a merits decision. A merits decision, however, issued at the same time or concurrently with a companion case that spoke directly to that issue where courts will often pretermit consideration of a jurisdictional issue because it's an open and shut merits matter. So I'm not entirely sure that you can treat the determination we made as to the funds transfer as a jurisdictional endorsement of your position. I'd like to address that because the Calderon case, in fact, the finding of this court, was that there was no subject matter jurisdiction in that case under TRIA. The court concluded that North Korea had been removed from the designated list when the judgment was entered, and, therefore, TRIA did not even apply. You went to 1610G, which is a different statute, and you interpreted whether or not this property could be reached under that case so that it was not foreordained under TRIA that the court would rule in the way that it ruled. Very different statute, and I don't think you can draw that conclusion about preordainment. You can't say that it was foreclosed by Calderon because it's a very short opinion that cites Calderon and says that's dispositive of this case, right? Well, the merits issue, the property interest that he had ruled, but not the fact that TRIA, and notwithstanding that Mr. Caruso had devoted a substantial part in the primary point of his briefing to subject matter jurisdiction, and the court went on beyond that and ruled on TRIA, on enforcement, and remanded the case. And, frankly, there are other parts of tranche three, which is what was up here before you, that are still in force and in effect, monies having been turned over, not electronic funds transfers, but other monies. And so our argument here, obviously, is that there was a merits decision, and there was an enforcement of subject matter jurisdiction. And also in the lower court, the same thing, Judge Marrero enforced. And, you know, there is now, and this came up in the last argument, there's an appeal in the Eleventh Circuit because Mr. Caruso, having been ---- You can't rely on Judge Marrero's judgment that was reversed by this court. No, I'm not relying on Judge Marrero's judgment that was reversed by the court. I'm relying on other judgments, and, in fact, the Southern District of Florida opinion references the fact that he went out of his way to contact Judge Marrero to determine whether or not he had granted full faith and credit, and that was done in the affirmative. The history of this case was the state court judgment was removed by the banks, was transferred over to Judge Marrero. Separately, the full faith and credit judgment was registered here. So you had two judgments running in parallel, state and federal. And they have been enforced numerous times. And, you know, again, our position is that there is a merits ruling, and there's got to be an end to this. The judgment you're aiming to enforce is $454 million, something along that order? No. The judgment, our judgment, again, you cannot enforce punitive damages. So the judgment is $100 million that was awarded to Mrs. Haussler. That's correct. Thank you very much. Thank you. Thank you. We'll hear from Mr. Maxwell. Good afternoon, Your Honors. Rourke Maxwell on behalf of the Bealdo FLEs. I'd like to start out by touching on an issue that we briefly touched on a minute ago, which is whether or not the bank has an interest in the funds at issue. And that runs, as Your Honors pointed out, directly from the CFCRs. I'm sorry. Before you turn to that, could I just confirm, so you have a $2.79 billion judgment? That's correct. Is that correct? That is correct. And part of that is punitive damages? Yes, Your Honor. And that also represents an increase. You had initially a judgment for $1.17 billion, and that was altered a few years later and bumped up to $2.79? But that's what you're defending right now? Yes, Your Honor. Okay. You're saying the bank has— It doesn't have standing in order to collaterally attack any of these judgments under Florida law. And as we cited in our brief, the bank, if it does not have standing under Florida law to collaterally attack these judgments, does not have standing to do so in federal court. It's clear from the Florida Supreme Court's opinion in Dame Rainey, which we cited in our brief, that in order for a party to collaterally attack a judgment, they need to have a preexisting interest in the property that the judgment is set against. In other words, the defendant's property. And BBVA never had an interest in this property. It still doesn't to this day, which is the same reason it shouldn't be able to receive restitution for a turnover order that relates to property for which it was a mere stakeholder. This issue is dispositive of this appeal as a threshold matter. And frankly, the district court shouldn't have considered it. In other cases in which this has come up, generally the district court has sua sponte, considered whether or not there was jurisdiction. And this is not one of those cases. To go on again, just as— And what's the significance of the fact that this is not one of those cases? Well, this is a case in which a bank that was a stakeholder under the FSIA of funds that have been blocked asserted that the judgments that were being held by the judgment holders were infirm based on jurisdictional grounds. Now, that's a collateral attack. I mean, under any normal circumstance, that would be a collateral attack on the judgment based on subject matter jurisdiction. And it's impermissible under Florida law. And therefore— Suppose they didn't come in and make a collateral attack. Suppose someone on behalf of the bank just threw a rock through the window with a note attached saying, by the way, you guys don't have subject matter jurisdiction. Would we not be obliged to consider whether we have subject matter jurisdiction, whether they have standing to raise that issue or not? Well, I think that goes again—perhaps there's a bit more complexity to that. When we consider whether or not the lower court that entered the judgment had subject matter jurisdiction in an FSIA case, there is deferential review to the findings of fact of the court that entered that judgment. And there's substantial precedent from this court that says that in very clear language in FSIA cases. So it's not as if it's coming out of the ether as to whether or not this court has subject matter jurisdiction over the claim. And particularly given the procedural standpoint that we're at right now, it was a challenge that the court that entered the judgment didn't have subject matter jurisdiction. And when that's made, it's a different standard than has been suggested. If a court enters a judgment and it had no jurisdiction to enter that judgment in the first place, isn't the judgment void? And this is a default judgment. It's not like there was a litigation in which there was a contested set of findings. And that's now a res judicata as to those who participated in that contest. This is a case in which the parties, as parties are entitled to do, defaulted, and decided, I take it, to take their stand later somewhere else when the judgment is sought to be enforced, rather than to litigate it in the form that they maintain didn't have jurisdiction. Now, they take the risk, I suppose, of if they lose, they can't contest the merits and so on. But they still have the right. Doesn't any party have the right to contest the jurisdiction of the court that entered a judgment? Your Honor, yes. And I think that you're pointing something out here is that the party against whom the judgment was entered would have that right. That is not what is occurring here. But on top of that, Congress established the rules by which default judgments can be entered under the terrorism exception to FSIA. And it is not a typical default judgment situation. Congress said that the court must be satisfied with the evidence that is presented to it under 1608E in order to enter a default judgment. This isn't a typical default judgment situation. The plaintiffs are required to show the court that is entering the default judgment evidence on the merits as to why the court has subject matter jurisdiction, as to their damages, as to the acts that were done. Clearly, it's not a typical default judgment situation. And the cases that have dealt with this have said that under these circumstances, the district court or the court in this case, the Florida State Court that's reviewing the case, is allowed to take evidence that it believes is satisfactory. And this can be a differing standard. It's different than any default judgment. Isn't any court entitled to assure itself of its jurisdiction and ask for proof? And if this were just a regular case where there was an assertion of diversity jurisdiction and the defendant doesn't show up, wouldn't the court be perfectly entitled to ask the plaintiff to demonstrate that there was diversity jurisdiction as a factual matter? Your Honor, I suppose that would be a case, but all the courts that have considered it have said that this establishes a higher standard than what is normally required in a standard default judgment in order for a district court to be satisfied with the evidence that's presented to it. And may I just ask one factual question? If we were to decide that it was up to us or up to the Southern District of New York to independently assess the subject matter jurisdiction, do we in this court have the full record on the facts relevant to that issue? Your Honor, what we could present to the court was a reconstituted record from the Florida State Court proceeding. There was an issue in the Florida State Court. But do we have that? I mean, as far as I know. Yes, Your Honor. I believe that that is in the record. That's in the record. So we have all the evidence that there is. Are you contending or either of you contending that you have more or different evidence that you could present to the district court on remand? Well, for Haussler, I'm not certain that all the evidence from the Florida Federal Court is in the record. There was a robust filing there. As Mr. Caruso knows, there was also an effort to find the file in the state court in Florida, and we were not able to find that. And that happened back in the Haussler case. That was all part of what was brought up to the Haussler panel. Well, if it no longer exists, there's not much we can do about it. What I'm trying to figure out is if this is a decision that the federal courts should make, are we in a position to make that, or do we need to remand it to the district court because the record is not really complete and there's more evidence that you folks might be able to present on this subject? As to the Violdos, the record that we have provided to the court is a reconstituted record from what occurred at the trial. It is not a complete record of what occurred at the trial. There was a problem with the court reporter at the trial where there began to be deposition testimony via video. Okay, I get it that it may be an imperfect record. What I'm trying to figure out is do you now have something in your pocket that you could present to the district court if we remanded this case that is not already there? The answer to Haussler is no, that there would have to be additional material lodged. As I said, there's a part of the record from the Southern District of Florida that's not over here. So to follow up on Judge Lynch's line of inquiry, I should think that after our ruling in the subpoena case, we should hold that Judge Hellestein at least should have revisited the jurisdiction issue in the matter of Violdo and Haussler. That's certainly, I think, a strong argument. Why shouldn't we do that? Indeed, why isn't that in your interest to have that opportunity to go before Judge Hellestein to adjudicate the jurisdiction issue? In his order that's on appeal, at least as to the Violdo appellees, the judge said that he considered the record evidence that we had presented to him at that time and was satisfied that the court, the Florida State Court, had sufficient evidence before it to make the conclusions that it did in its final judgment. Judge Hellestein said that as to the Hausslers as well, isn't that correct? Judge Hellestein treated Haussler and the other creditors the same, but as your honors know, our position in the case is very different. We believe there is a race judicata factor here. But what we're talking about is the record complete. And I answer to that, no. I don't think that the Southern District of New York record in this case is complete. So what kind of evidence is there that is missing? There is affidavits of Professor Shu Slickey, who's an expert on Cuba. We had some of these in the record before us. I know. I was looking for them right before the argument, and I cannot confirm that you have everything because I know in putting the appendix together and we determined that maybe at least one of the more comprehensive affidavits may not be lodged. I think we have two of them. I think we have two. So that's an expert. That's not... That's right. And we did have testimony and affidavits of one of the congresspersons who was a sponsor of 1605A7. Okay. I just wanted to make sure. Yes. But why don't we go back to this possibility that we send this back to Judge Hellestein for a more complete record and an exhaustive consideration of the jurisdiction issue? I would think that's in your interest as opposed to the alternatives. For Haussler, again, argument one raised to the contrary. If you're not buying that, remand is probably the second of the alternatives. And is it your view that if we remand that Judge Hellestein would be able to hold hearings and to find new evidence? I don't see why not. But, again, that's a revisitation of a state court judgment where that was all done back in 2007. I guess it could be new evidence regarding how the Florida court actually conducted its affairs. Right. I suppose that could be, too. I believe that my state court judge has passed away. And that would have to be recreated in consultation with the Florida judges. Again, everything you're talking about here is the whole reason that raised judicata should apply. I'm mindful of a discussion in the Weininger case decided by Judge Marrero. It never went up to this court. But he had a thoughtful discussion about the fact that litigation has to end sometime. And when stakeholders come in and try to tip the balance in some way, the courts should respect the process. And there's been substantial process in the Haussler case, numerous courts. And, again, it's our view that that should be respected. Referencing some of the Supreme Court cases that say the best that Mr. Caruso has is potentially that there might have been a mistake made on jurisdiction. And that's just not enough. I think we have the arguments. Thank you very much. Mr. Caruso. Thank you. Let me start with Mr. Maxwell's argument. This is not a collateral attack, as you held in footnote 9 of the Vera opinion. This is a challenge to the subject matter jurisdiction of the United States District Court. It has nothing to do with what the Florida court did. It's so fundamental. Every federal court has to decide its own subject matter jurisdiction. And Judge Hellestein didn't have it. Judge Swain didn't have it. And Judge Jordan didn't have it, based on what I'm arguing. So this is not a collateral attack. Next point. Mr. Maxwell talks about 1608 review. Judge Swain was not sitting as an appellate judge reviewing the findings. I want to back up on that. It is a collateral attack, is it not? Or put another way, if there had been a contest, either by Cuba or by you, in the Florida courts, about these very factual issues and they were determined against you. It's the same issue, the issue of whether Judge Hellestein has jurisdiction. The reason he does not, if he does not, is because of the Foreign Sovereign Immunities Act and the exception that they are trying to invoke. And those would be the very factual premises. That would be the same reason why the Florida court didn't have jurisdiction in the first place. Yes, but neither Cuba nor BBVA was a party to those cases, the original cases. And therefore, as a stranger to the federal cases, we have an absolute right to challenge the jurisdiction. And the prior findings don't have any value at all. As the court said in Vera, the findings of the state courts do not bind or aid the district court, which is required to analyze the record independently and determine its own jurisdiction. So the idea that Judge Swain, in this case, didn't have to find subject matter jurisdiction is completely contrary to all basic principles of federal jurisdiction. Anyway, this is not, she wasn't sitting as an appellate court reviewing the Dade County Circuit Court. And right. And Mr. Perkins suggested that you did litigate this issue or re-litigate this issue in the federal court in Florida. Could you just explain to me why that's not true? We asked Judge Marrero in the original Hasler case, we wanted to prove that these judgments were void and defeat the turnover application on that ground. Judge Marrero said, I'm not hearing that. If you want to challenge the judgments of the Florida courts, go to the Florida courts. Now, so therefore, he sent us to Judge Jordan in Miami. And we went to Judge Jordan. There was no evidence. The idea that there's evidence in that proceeding that would impact the record review here is preposterous. It was a legal argument. It's a motion for motion under 60B-4. Pure legal argument. The Florida state court received evidence, though, right? The Florida state courts received evidence. That's in the record, as far as I know. All of it's in the record. And while we're on this subject, let me go to the point about a remand and why that would be unnecessary, just as it was unnecessary in VERA, if you look at footnote 8 of VERA. The reason it's unnecessary is because no matter how much evidence they put in about what happened to Haussler's brother in Cuba in 1960, or Valado in Cuba in 1959, it doesn't matter because the State Department never referred to that. The dispositive question here is whether Cuba was designated a state sponsor of terrorism, quote, as a result of these killings and tortures. It doesn't matter what evidence they put in because in 1982, the State Department told us why they designated Cuba, and it has nothing to do with these particular cases or with retaliation against expats in general. So a remand would be the very opposite of bringing this case to a close. There's nothing for the district court to look at. The VERA establishes the rule, and this court should simply reverse based on VERA. So I hope I answered your question about the Southern District of Florida. Okay, and I discussed the remand. So just let me say a couple of things in response to Mr. Perkins' points. Judge Carney, you got it right. Why isn't Haussler collateral estoppel against me here? Well, there's one sentence in Haussler. It's a case I won. I won on the merits. I got all the financial relief I sought. And there's a sentence at the end that says we've reviewed the other contentions and find them unavailable. So what does that mean? It's a little presumptuous for some of us to tell you what you meant because you were on the panel along with Judge Hall. But if you want my two cents, looking back on it now. Just on that, your two cents are as good as anyone else's. It's not a question of what was the private reasoning that was not made public. What counts is what the court said and did, not what the interior reasoning might have been. I don't think it would be proper for us to issue an opinion now that said either, oh, we just blew it. We didn't pay any attention to the jurisdictional issue. Or, oh, yes, we decided that there was jurisdiction. Didn't say anything about it because we didn't think we needed to and went on and decided the merits. I don't think either of those would be proper. The opinion stands on its feet. It says what it says and it means what it means. And if it's cryptic, I guess we all have to deal with it. So let me tell you what I think about looking back on it. Is that entitled to collateral estoppel effect against me here? I set forth seven reasons in my brief. Obviously I'm not going to mention all seven here. But let me mention three if I have enough time. Why don't you mention your three and then wrap up, okay? Right. But the first one of three is the one Your Honor mentioned, which is it's not clear that the prior panel was required necessarily decided the subject matter jurisdiction issue. It's not clear because that panel could have exercised hypothetical jurisdiction based on the result in a companion case, which in my case, two business days later, was disposed of in a per curiam paragraph. So I think it's a classic situation for hypothetical jurisdiction. And looking back on it, this panel can't say that that issue was clearly and necessarily decided. And then the other two points I'd make are really almost in the alternative. Even if there were collateral estoppel, that's a flexible doctrine and it's not exercised where that would be unfair. And here, Haussler engaged in conduct that prevented any judge from deciding the subject matter jurisdiction challenge that I had. They told Judge Marrero we are enforcing the federal judgment. They said that repeatedly. Marrero sent me to Florida. I went to Judge Jordan because they were enforcing the federal judgment. Judge Jordan then called for the government to come in and say what really were the reasons why Cuba was designated. And then, sensing vulnerability, Haussler slipped on something into Judge Marrero. Suddenly, they wanted him to enforce the state court judgment. And Judge Marrero claims that he did. He said, I've enforced a duly registered state court judgment. But there's no such thing as a matter of law. Under Section 1963, no one can register a state court judgment. You can only register a federal judgment. But anyway, Judge Marrero signed that. And then they ran back to Florida and told Judge Jordan, oh, you don't have to decide this. It's moot because Judge Marrero enforced the state court judgment, not the federal. Let's just say it's a flip-flop. And as a result of that, neither Judge Marrero nor Judge Jordan ever decided my issue. That's not fair, and he shouldn't have collateral estoppel based on that now. I'll stop.  Thank you very much. Thank you. I think we have the arguments well argued. We will take a brief adjournment, please. Judge Cabreras, can you hear me all right? We can't hear you, so we'll try that again. Yeah. Okay, good. All right. Thank you very much. All right. The motion calendars are all submitted, and I'm Judge Wesley. I'm standing in for Judge Cabreras, who's presiding from afar for reasons that couldn't be into New York today. And we'll have arguments in two cases, United States v. Brian Cole. Ms. Aldea. Hello, Judge. Haven't seen you in a long time, Ms. Aldea. Nice to see you again. Nice to see you, too. So there are three issues that are actually presented in this case. However, given the limited amount of oral argument time and the fact that one of them actually involves a lot of sort of novel issues, I'd like to start with the issue with respect to the court's charge. To crystallize the problem here, pursuant to the court's charge that was given in this case, the jury could have convicted defendant of deprivation of rights under color of law with death resulting under the enhanced penalty provision of Section 242, even if it found that only bodily injury, not death, was foreseeable, and even if it found that given Spear's condition in the preceding takedown, defendant's kicks did not actually cause death. In other words, the problem here was that as the charge was given ---- The charge mentions bodily injury. It says bodily injury or death. Correct. The bodily injury aspect of the charge was not objected to by your predecessor. Right? That's not entirely true. Well, let me be more specific. Were the words bodily injury, that aspect of the charge, was that objected to? The answer is no. Well, not explicitly in the way that I'm doing in the brief, but what I would actually suggest is that if you look at the request to charge, and I'm not just talking about the pretrial request to charge, but at the charge conference just a day before the charge was actually given, there was a request to charge here, and that request to charge specifically asked that the charge that be given, I'm sorry, is that, quote, death was a natural and foreseeable result of the acts that were intended to deprive Ronald Spear of his constitutional rights. So that was just a day before. Death was foreseeable. And also explicitly requested language, quote, that death could be expected to follow as a natural consequence. Let me ask you this. What was the defendant's theory of the case in front of the jury? So the defendant's theory was that the death in this case was caused by the preceding takedown. He was dead before he was assaulted. Well, that's not entirely true either. Well, wait a second. What happens here is there's a bit of a dust-up between Mr. Cole and the victim. Correct. And then the victim is subdued by the other correctional officers, correct? Correct. And he's on the floor. And then Correctional Officer Cole, defendant, comes over and begins to kick him in the head, correct? Correct. And the defendant's theory is that the victim is dead at the time he's on the floor before he's assaulted. Actually, so the defendant's, this is why I'm drawing this very subtle distinction to that, the defendant's theory, as testified by his expert, was that death is actually a process. So because the only element that was at issue here was causation, what the defendant actually argued was that death was irreversibly caused by the preceding takedown. In other words, there was a cataclysm surge that resulted in this incredible stress on his heart. His heart was already in a weakened condition. So it was a sole cause as opposed to a competing cause. Exactly. Exactly. And there was a competing theory from the government that the death could have been caused by the repeated blows to the head that Officer Cole administered to this person who was restrained and on the floor. Correct, Your Honor. And so, but with respect to the foreseeability element, the defendant's theory in this case, and the reason that actually I think even under plain error to the extent that that would be the standard to apply, this would still be error here, just on foreseeability. The problem here was the defense's theory was that Cole actually did not kick the victim sufficiently hard to cause death. And that was supported by a tremendous amount of medical testimony in this case. There was no evidence of any external bruising, any external abrasions, any external cuts that you would expect to see if indeed there had been a kick with the force of a field goal, which is what one of the government's witnesses testified. So there was actually the argument that was being made by the defense on foreseeability was the manner in which Cole actually kicked the victim in the head was not sufficiently hard in order to reasonably or foreseeably result in death. This was also, by the way, supported by the fact that, you know, to the extent we know that intent is not actually required here. What do you make about the next sentence in the charges? It says, with respect to causation, the government must prove beyond a reasonable doubt that the acts that made the defendant guilty of count one were either a but-for cause of Speer's death or, in the alternative, that the acts were an independently sufficient cause of his death. So that doesn't go to proximate cause, which is the first requirement. That goes to actual cause, which is the second. So what the government is trying to do here to get around what I think is the most egregious and problematic part of this charge, the bodily injury or death portion of the charge, that's a proximate cause requirement. And the government is saying we don't need to prove proximate cause, which is directly contrary to the Supreme Court. The charge says the government need only prove that bodily injury or death was a natural and foreseeable result of the acts. It doesn't say that it was the result of the acts, but it was a natural and foreseeable result. And the reason I think that is there is that if I had just pushed someone gently and suddenly they had a total cardiac arrest, I wouldn't anticipate, I would not naturally perceive that I would either cause physical injury or death to that individual. And so it's categorizing the kind of act that's necessary to have been performed. And then you insert the causation element after that. So it's not that he intended to cause bodily injury, but at least he understood, he or she understood the act to have been one that would have. Well, so it's true that definitely intent is not required. However, foreseeability or the proximate cause requirement, which Burrage, the Supreme Court in Burrage, actually said was generally required, which this Court is telling us is not. This language is not about proximate cause. This language is about understanding that the act that you're performing is foreseeable, that you might cause bodily injury, but then that's not enough. Right. They still have to prove a connection to that act to death. Well, so, but my argument on that is it's actually not that it's foreseeable that you might cause bodily injury. What is required is that it be foreseeable that you cause death. That's the foreseeability requirement. And this is different than the drug offenses. Because all it has to be is a cause. You don't have to intentionally cause death. You could have an eggshell victim, a person who's very, very susceptible. They're in a wheelchair and you toss them over something or you overturn them and then they hit their head on the ground and they die from a hematoma. That's, would that qualify? It would not qualify for the. You intended to hurt them. Well, that's a different, so there's a combination of errors here. The second problem, which goes to the portion of the charge that Your Honor read, and they kind of work in conjunction here, is that in this case there actually was an exception to the forecause requirement as well. I understand that. Which was this independently sufficient cause. So here you had a situation where it was possible that all that was foreseeable was bodily injury, not death, combined with the fact that death was not the actual cause. The jury could have found. Well, they could have, but they didn't. There was evidence the other way. Yeah, but the difference is that the government. That doesn't make the charge wrong. And you're kind of, you're conflating sufficiency with the charge. Actually, Your Honor, the government is conflating sufficiency with the charge because the fact that the evidence was legally sufficient to support their view when viewed in the light most favorable to them, that in fact there was an independently sufficient cause of death is not. Let me ask you this. Does it have to be the only cause? It does not have to be the only cause. Ah, so it could be one of several. There can be several proximate causes, can't there? That's true. So let's pursue this for a second. So you've got a person who's got a cardiac condition, and you punch them several times, and that assault in connection with their cardiac condition causes them to die. Are you liable under the statute? That would be the but-for cause you would be, yes. Ah, and isn't that exactly what happened here? No. Okay. And the reason that it didn't, and the reason that that second part of the charge was wrong, I'm going to actually cite the example from the United States Supreme Court decision in Burrage. That exception cannot be allowed to swallow the rule. Independently sufficient cause is very rare, and the example that was given there as to when that kind of charge is applicable at all was you have a defendant who is shot and at the same moment is simultaneously stabbed. Each one of those two things was clearly and incontrovertibly a cause of death, an independently sufficient cause of death. And key to the analysis, they happened concurrently. The reason that the government's analysis fails here, and the reason that second portion of the charge was improper under the facts of this case, is that there's no question that the two causes were not concurrent. They were consecutive. The takedown happened first. During that takedown, he stopped moving. He said, I can't breathe, I can't breathe, after he had been clearly influenced by a catechal surge that allowed this weakened man to perform one-handed push-ups with a 215-pound man on his back. After that catechal surge, he immediately says, I can't breathe, I can't breathe, and then at some point while Officer Torres is on his back and before the kicks, he goes completely limp and nonresponsive, completely. That was death. That was causation. And whether he then engaged in agonal breathing or whether he then made sounds or moans or grunts that actually continued even after the kicks does not change the fact that the but-for cause here was only one. Okay. You've got your rebuttal time. Thank you. Ms. Vargas. Good afternoon, Your Honor. May it please the Court, Jeanette Vargas on behalf of the government. I represented the government at trial in this matter. Okay. I would like to start with the proximate cause issue that defendants also began with. Now, their primary challenge is to the causation instruction, but at best their challenge has been forfeited, if not affirmatively waived below. As Your Honor noted, they did not raise an objection to the proximate cause instruction at the charging conference before Judge Preska. Instead, they did propose their own language. That is true. The judge never ruled upon that language. It never had cause to accept or reject because in the subsequent colloquy, the district court inquired with defense counsel as to whether the government's charge, the government's proposed proximate causation charge, would suffice for their purposes, and they agreed that it would. So at that point, they forfeited or waived by affirmatively agreeing to the proposed language by the judge. The judge didn't have cause to know on that record that there was an objection to the inclusion of bodily injury to the causation instruction. In fact, the district court would not have cause at all to know that there was even an objection to that charge. So if there's any appellate review at all, it's plainly under the plain error standard. So under the plain error standard, there has to be a reasonable probability, not a possibility, not a remote possibility, that the requested language would have affected the outcome of the trial. There's no such possibility here. Let's start with the fact that the jury, by convicting Officer Cole of violating Section 242, the core offense, necessarily found that he engaged in excessive force by kicking Ronald Speer repeatedly in the head, resulting in bodily injury. Now, the jury made that finding necessarily, and it necessarily found that those kicks were of sufficient force to have killed him, because they found but for causation, which was indisputably charged. So they have found that there were kicks, and they have found that the kicks were either actually caused his death or were independently sufficient in force to have caused his death. Given that record, there's no reasonable probability that a change in instruction would have resulted in a different verdict. Common sense is sufficient to tell you that it's reasonably foreseeable that kicking someone in the head can result in their death. You don't need medical expert testimony to tell you that, but in this case, we actually did have such medical expert testimony, and all the experts, including the defendant's experts, agreed that blunt force trauma to the head, sufficient to cause the types of bruising on the brain that were observed in the autopsy and that the jury had evidence of before them, would have been enough to kill Ronald Spears. This common sense understanding is precisely why Officer Cole, as a correctional officer, is trained that you don't strike an inmate in the head, because that can result in death. They're trained in that. Correctional officers know it. So it's legitimately foreseeable. I get that, but don't you also have to show that there's a connection between that and his death? Not just that it's capable of doing it, but don't you have to also show that it played a role in his death? And we did do that, Your Honor. The evidence was overwhelming, and the jury was charged both on proximate cause and but-for causation in the causation instruction. So the jury necessarily found that it was not just reasonable to believe that the kicks could have resulted in his death, but actually either did so, in fact, or were independently sufficient to have done so. So that was the but-for element. And, yes, they do have to make that finding. They did make that finding. There was ample evidence in support of that finding. The medical evidence was very clear, and although the defendants try to make this a very complicated chain of causation, in fact, the line of causation is very, very simple. Mr. Speer was alive on the floor. He was talking, he was breathing, he was moving. He was restrained by Officer Torres. He was still breathing. He was still alive. And then he was kicked in the head, and a minute later, he was dead, and we had medical experts explain the mechanism of death. He had bruises, subscapular bruises below the scalp and a subarachnoid hemorrhage, which caused bleeding onto the brain. The mechanism of death in that case is that when there is bleeding onto the brain, there is what's called a catechal surge. Dr. Schneller testified at length about how the catechals affect the heart and lead to a cardiac arrest, and that this is a known medical phenomenon, the bleeding on the brain leading to this type of hemorrhage. So this was not something that was attenuated. There was nothing unusual or unforeseeable about or extraordinary as to what happened here. He was simply kicked in the head, and he died approximately a minute later of those injuries. With respect to the independent sufficiency argument, counsel alluded to the charge on this as being improper. I would like to reiterate the recent case law that we cited in our 28J letter that has come from the Sixth Circuit and the Eighth Circuit in Ewing and Lewis that have both found that such charges in death-resulting cases are appropriate. No court has ruled to the contrary. So certainly there's no error at all, let alone plain error in the independent sufficiency charge. As to the point that this case is factually distinct from the analogy that was given by the Supreme Court in Barrage, I would point out that, if anything, this case is very similar to the facts of the 841 drug offenses such as Ewing and Lewis, because the courts are usually considering the effects of perhaps two doses of cocaine or the effects of two different types of drugs, heroin and cocaine, and are both sufficiently found in the bloodstream to be lethal. The government theory here was that, to the extent we're talking about two separate surges of catechols, one caused by the hemorrhage and one caused by the takedown, if they were both acting upon the body simultaneously, in the way that cocaine and heroin may be perhaps taken together or taken shortly in time one after the other, if both are sufficiently in high doses to have caused death, under the independent sufficiency theory that these courts have endorsed, then the but-for causation standard has been satisfied. If Your Honor has no further questions, the government respectfully requests that the judgment of conviction be affirmed. Thank you, Ms. Vargas. Ms. Zeldin, you have two minutes. So the first thing I just want to clear up is that, with respect to the independent challenge to the legally sufficient cause instruction, that clearly was preserved, and that was preserved by virtue of the letter that was explicitly submitted raising identical arguments to what we're raising here, which is namely that the exception applies only in rare circumstances that are not applicable here. So that's number one. So to the extent that the government tries to apply plain error as well to that, that's not the appropriate standard there, although more arguable as to the first point. Again, the main problem here is that, in conjunction, what these two charges did is they allowed the jury to fully credit the defense version of the events here, that the kick was not sufficiently hard to foreseeably cause death. In other words, it only would have been foreseeable that it caused bodily injury and that this was not the actual cause of death and yet still to convict. And so to the extent that the charge allowed the defense, completely eviscerated the defense, allowing the jury to credit in total the defense theory of the case and still convict, it was plain error. And it's true that this happens in conjunction, when you take the two charges in conjunction with each other, but it nonetheless happens here. This is not like the drug cases, and it's actually very different than the drug cases that were cited in the government submission because there is a distinct difference here. The language for the original part of the charge that deals with either bodily injury or with death being foreseeable makes sense in the drug cases because there, the statute does not provide for enhanced penalty for death resulting as opposed to for bodily injury. In this case, it does, and it's a big difference. Just the deprivation of rights is a misdemeanor, one-year imprisonment. If bodily injury results, in other words, if that's foreseeable and that's the result, it's ten years maximum. For death resulting, it's a life sentence or the death penalty. So to say that a person, I mean, the rule of law that this court would be articulating would apply to all of these cases. To say that a person can be subject to the death penalty because death results from an intent to cause or from a foreseeable event of causing only bodily injury where, in fact, it doesn't even lead to the death of the individual victim is an aberration, and it does violate due process. Okay. Thank you. Thank you. Matters deemed submitted, you'll hear from us in due course. Nicely argued. Good to see you again. I haven't seen you in a long time. United States versus Juan Thompson. Good afternoon, Your Honors. May it please the Court. I'm Edward Zass of the Federal Defenders of New York, here on behalf of Juan Thompson. The sole issue on this appeal is whether the district court erred by enhancing Thompson's offense level for violating a court protection order. And I'd like to start with our 28J letter, which pointed out that this court now has an advantage that the district court didn't have. Guidelines Amendment 805, which took effect on November 1st of 2018, now clarifies the meaning of court protection order. And it's a clarifying amendment, so although it was issued after sentencing and, indeed, after the parties filed their briefs, it applies to clarify what the guideline always meant. The amendment provides, in pertinent part, that a protection order must be consistent with 18 U.S.C. 2265B to qualify as a court protection order. And Section 2265B specifically addresses the subject of ex parte protection orders, which are the orders at issue here. And it provides that in the case of ex parte orders, notice and opportunity to be heard must be provided within the time required by state law and, in any event, within a reasonable time after the order is issued, sufficient to protect the respondent's due process rights. What do you make of that? What does that then mean? Tell me what that means in your view. Well, I think it confirms the position we took, both in the district court and in our briefs, which is, and it refutes the government's principle argument in its brief, which is that this enhancement is a strict liability enhancement. So long as there was a violation order and the defendant's conduct contravened the terms, they've informed me, as of this morning, that they're no longer relying on that argument in light of the amendment. Okay. So as applying that new language to this case, the first question is, was Thompson given both notice and an opportunity to be heard within the time required by state law? And that invites the question, which is under New York law, when is the person supposed to be given notice and an opportunity to be heard? Right. So I'm not an expert on New York law by any means, but I went in under the Family Court Act, section 153-b-c. An ex parte protection order must be served promptly. Right. In this case, the first ex parte protection order was issued on August 5 of 2016. Right. That's 63, right, of the appendix? Well, that's, I think, the summons. I'm sorry. You're right. I apologize. It's 60. The ex parte order is 61. Right. Temporary order of protection, page 61. Right. Yeah, I'm just checking the date. Yes, that's the first order of protection. Right. I think it's undisputed. It was undisputed below and undisputed here that this was never served. Right. On Mr. Thompson. Right. Go ahead. Nor is there any evidence that he was given an opportunity to be heard by any court to challenge it. So now, again, I don't want to fall. Let me see if I understand this because the case has morphed a bit. It's morphed from the brief. Yes. So let me see if I appreciate it and my brother in New Haven can hear us. What you litigated below was whether he knew about the order of protection. And your view was state law decided that for him to have violated the order of protection, he had to know about it because New York law is fairly clear. You don't actually have to be served with it, but you have to know what the contents of it are. You can't just say to somebody in court, there's an order of protection against you. It has to be read to you. And that's what the court of appeals cases go off on and some of the intermediate appellate court cases go off on. The government's position was it didn't have to be a knowing violation because knowing is not in the guidelines. And they cite other instances where knowing is in the guidelines and so they draw that distinction. That's a very good argument to make. And they say, look, this isn't really looking at the venality of his knowing violation. It's looking at the fact that an order of protection was issued and then even if he didn't know about it, he continued and did other acts that were then consistent with what generated the original order of protection. And they cite to, like, the possession of stolen property and you don't need to know that the property is stolen and stuff like that. So those are the kinds of enhancements that occur without knowledge. Now, and so there was a debate about, does state law decide the issue of the enforceability of the order or does it not matter about that because knowledge isn't really necessary, it's just the existence of the order and then the conduct that is post the existence of the order. That's where the rubber met the road at the district court, right? I think you've characterized it essentially correctly. And I just remind you that the district court, understandably, I don't mean to fault the district court, it didn't have the benefit of the answers we now have from the Sentencing Commission. And so what New York laws focus on was to hold someone in contempt of an order, they had to know what the order said. And the government's response to that was, it doesn't matter because whether it was or was contemnatious is irrelevant to the enhancement, don't worry about your life. Okay? Oh, thanks. Sorry. Now, in the interim, with 28J, now the issue seems to be whether the order complies with a notice and opportunity to be heard when it's ex parte. Well, I think to be, yes. Whose law decides that? Well, there's now two pieces of law that seem relevant as I read this definition. Fair enough. The first part says you have to have notice and opportunity to be heard within the time required by state law. Correct. That's the first part. And in any event, within a reasonable time. Yes. But then there's a constitutional, federal constitutional question. Is that time sufficient? Is that opportunity to be heard sufficient to comply with federal due process rights? Okay. Okay. Now, let me ask you this, and then I'll let you say a little bit more, and then I'll ask you to sit down. We know that the summons was attached to both preliminary orders, the temporary orders to show cause, right? I'm presuming that's correct. Okay. And because there's a return date on the summons. Yes. And where he was supposed to go, Mr. Thompson was supposed to go, and that would give him an opportunity to answer to this in accordance with the Family Court Act. So, I mean, if he had, like, an alibi and said, I never did this or something, they could contest it at that point in time, right? Well, I have a number of responses before I give you a yes or no, because it's not exactly a yes or no straight answer. The first thing is the obvious question is, was the summons ever served on Mr. Thompson? Well, we're going to get to that. Oh, okay. We're going to get to that. Yes. I'm sorry. I didn't mean to jump ahead of you. But the reason I started with it is, obviously you have no meaningful opportunity to be heard if you don't receive any of the papers. But this summons itself is about responding to the family court petition. The summons does not tell you that there was an order of protection issued. Well, but the summons, as I understand it, the summons was attached to the temporary order of protection, was it not? I don't have knowledge one way or the other. I'm not sure the record tells us. Oh, okay. I'm not sure it tells us. But you'll notice that the return date on it. Well, I don't think it matters whether it was or wasn't, as long as it was served. But in any event, because we don't know whether the temporary order and the summons were served or, excuse me, were attached. But we know that both were not served. We know that both were not served. That's my understanding. I mean, the government raised the summons only in its 20HA on this past Sunday. But I don't see them claim that the summons were served, nor have I seen any evidence of service of the summons. That's your question for the government. But also, I just point out that the summons, the return date for the summons is October 13, 2016. Right. The order of protection was issued ex parte on August 5 of 2016. I understand that. And was due to expire on August 13, 2016. So there's a question of, is that constitutionally sufficient opportunity to be heard? If you're subject to it for two months, and the only day you can come into court and challenge it, assuming you were ever notified of it, is the day it was going to expire. Let me ask you this. Yes. Given this clarification, isn't a remand an order? I would never say no to a remand. Almost never, Your Honor. Are you going to say no now? No, I'm not. I think it would be appropriate, I think it would be fair to the district courts to consider his prior finding in light of the recent amendment. I think if the government had any new evidence it wished to present, it could do that. I think if the judge, yes, I'm sorry, Judge Cabranes, were you going to ask a question? To follow up on Judge Wesley's question just now, what is it that you want from us? Well, I'd like to know. What's the remedy? It's an order vacating the sentence and remanding for resentencing. And I'll leave it up to the Court whether you want to specifically remind the Court that it's free to revisit this in light of the new definition. Another way for the Court to go, perhaps, is to say it doesn't matter. I would impose the same sentence regardless. Well, certainly he could because he gave you the maximum, which was way above what the guidelines gave him anyhow. He could, but he didn't give any indication that he would do that if he calculated the guidelines lower. Well, if we were to conclude that somehow this clarification altered what the judge should have been thinking about, then a vacature wouldn't necessarily lead to our concluding that the judge was wrong. It was only that the clarification asked the judge to consider some additional information that was not necessarily within his sphere at the time that he made the original decision as to whether it was knowing or didn't need to be knowing, et cetera. That's absolutely correct. I mean, my own view, and I put it out for what it's worth, is on this record. I don't think it supports finding the required findings now under the amended definition. But the Court does not need to resolve that at this moment. So it's on this record, and presumably Judge Castell on a remand would be able to expand the record as you and he and the government agreed would be appropriate. I believe that's right. I believe that's right. And that would be a completely fair result. I mean, the District Court, as we said, didn't have the benefit of this guidance. It's not that he acted contrary to it. He just didn't have as much information as we now have. Is there any reason to believe that this would be in your client's interest in the long run, that he's on remand? Is there a reason to believe that he would have a different view of the appropriate sentence? Well, I think there's hope. I think the government, as part of the plea agreement below, had agreed that a within-guideline sentence was a fair and just sentence on these facts. Probation asked for a guideline sentence. In fact, at the low end of the range. There are some equities in Mr. Thompson's favor that are under seal, so I'm not going to go into them. But there are reasons that the District Court might come down from 60 months. It might not be much. It might be 55 or 50. But I think there's a reasonable probability, and the Court can decide what's appropriate in light of this new information. How long has Mr. Thompson been in jail? Your Honor, let me just take a look. I don't recall offhand whether he was remanded right away or whether he was remanded. Since March 2016. March 2016? March 2017, Your Honor. March 2017. So he's coming up on his second year in prison? Yes, Your Honor. All right. Okay. We'll get it. I'm sorry. I didn't mean to. That's okay. No further questions. Thank you. You've got your meeting time. Thank you, sir. Mr. Warren. Good afternoon, Your Honors. AUSA Jacob Warren. I represent the United States in this appeal, and I also represented the United States in the proceedings below before Judge Costell. In light of Amendment 805, the government is no longer relying on the first argument in our brief, that knowledge of the protection order is not a requirement for purposes of the relevant sentencing enhancements. So as Mr. Zass said, the idea of strict liability. The government didn't advance that argument below before Judge Costell, and this Court should still affirm because the district court's finding by preponderance that the defendant had actual knowledge of the order of protection was not clearly erroneous. And maybe you're right about that, or maybe you're not, and I'm inclined to think probably federal law decides the issue as opposed to state law. But what about the amendment? The amendment, where in the record do we know that this ex parte order that notice and opportunity to be heard was provided? To Mr. Thompson. I think we have from the record, Your Honor, that he had knowledge of the protective order. Sure he had knowledge of the protective order, but I note to you at page 45 of the appendix, note one, the government concedes the defendant was not formally served with the order of protection. So if the government didn't serve him with the order of protection, did it serve him, do you know that he was served with the summons, summing him into a family court? That's not in the record. So then tell me then, tell me then, as an officer of the court representing the United States here, tell me then how you know that there's any way to sustain a finding of which there is none, that this ex parte order he was provided with a notice of opportunity to be heard. There's none. Is there? It's a simple matter. You don't serve the order of protection, you don't serve the notice, summons with notice. Do you have anything in your file that tells you that a summons with notice to appear in family court to answer an ex parte order, an order that was obtained without him being present in court, was obtained and that he was then given an opportunity to come in and contest it? Do you know that? No, Your Honor. Okay, you don't. And so you have no way of knowing that this now qualifies as an order of protection under the guidelines, do you? I understand, Your Honor. Yeah, you do, so answer my question. It's very simple. Yes, Your Honor. There is evidence in the record that... Look, do you want this remanded or not? You're an officer of the court here. You know what the guidelines say. Yeah, I'm just looking at... Yeah, you do. Go ask, consult with you. Okay, Mr. Warren. Yes, Your Honor. All right. Your Honor, the government's position is that remand isn't necessary here because under Casciano and under Axelrod, actual notice satisfies... But listen, with all due respect, I'm somewhat familiar with New York law. Casciano and Axelrod are about what kind of notice is necessary to hold someone contempt for violating an order. That's what that's about. And so someone has read an order in open court, okay? Now, they don't necessarily read to you that they're in court now. They were there. They understand it, okay? This is about someone who wasn't there and who's entitled under both the guidelines and, I might add, New York law, to notice. That's what the summons is all about. The summons says, look, you've got to come in here and contest this. Here's when you have an opportunity to hear it. Because this order, which allows you to be immediately arrested if you violate it, was obtained ex parte without you ever even knowing about it, with no notice to you whatsoever. You had never given a chance to contest any of this. That's what this case is about now. Not the Axelrod notice. That's why you guys are all, you've confused this. You've conflated this. Axelrod is talking about knowing what the order of protection says. Stay away. Don't come near me. Don't make a phone call. Don't come to my house. And when you're given those orders, if you go to the house, you make a phone call, you get close, you're in violation of them. You don't have to have the paper in your hand. But if you know about it, Axelrod says knowing it is enough. That's not the knowing it here. This is providing him with notice of an opportunity to come in and contest it. That's why that summons is attached. I would bet you a million dollars it was attached to the order of protection. But the problem is you don't have an order, an affidavit of service. Not your fault. It may exist. And you may go to the family court in Bronx and get that order, that affidavit that says that it was served. And if you do, then you've got an order of protection under the guidelines, and he's got a big problem. But we don't have that here. Now, you've said that this is a clarification. You've agreed with your opponent. Rightfully so. I think wisely so. Okay. But the game is different now. I'm not trying to make it a game. The rules are different. The rules now are that for this to be an order of protection when it's an ex parte order, notice of an opportunity must be provided. Now, you've got the notice, but you can't prove the provider. Isn't it simpler, yeah, to follow up on Judge Wesley's question, from the point of view of the government, as part of a ministry of justice, as they say, Why isn't it in your interest to simply agree or remand to Judge Castell so everybody has notice and can review these matters? It seems to me it's in your interest as much as it is in the defendant's interest. This is not the hill on which you wish to die. Well put, Kelly. Yes, Your Honors, and the government would stand on the second argument in its brief, but, of course, if this court were to remand, the government would have the opportunity to present additional evidence and litigate this issue. Mr. Warren, I don't know how long you've been at this job, but this is a case where you should have foiled them, okay? And you go back to your office with your supervisor and say, The Senate chair said this was one where you, as a member of the Department of Justice, we see the Department of Justice regularly walk in here when confronted with an issue like this, which is clear. I get advocacy, I'm all for advocacy, but this ship has sailed. Thank you very much. Mr. Zas, do you have anything to add? All right, the matter is deemed submitted. You'll hear from us in due course. That completes the calendar for the day. Thank you very much. We stand adjourned.